IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | Case No. |
| 1535 ½ Lewis Street, Charleston, West Virginia 25311 | 2:24-MJ-00087 |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Brandon S. Holestine, Postal Inspector, United States Postal Inspection Service (hereinafter "USPIS"), Charleston, West Virginia Domicile, also hereinafter referred to as the "Affiant," being first duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  Your affiant is an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 3061.

2.  I am a Postal Inspector, employed by the USPIS since April of 2017, and currently assigned to the Charleston, West Virginia Domicile. I am a sworn Federal Law Enforcement Officer empowered to investigate criminal activity involving or relating to the United States Postal Service (hereinafter "USPS") and United StatesMail. I am currently assigned to investigate matters that involve the mailing of illegal narcotics, dangerous drugs, and their proceeds. I have received training in the detection and investigation of prohibited mailing offenses. Prior to my assignment in the Charleston, West Virginia domicile, I was assigned to the USPIS Cleveland, Ohio field office where I also conducted investigations involving mailing of

1

illegal narcotics, dangerous drugs, and their proceeds, and was assigned as a task force agent with U.S. Drug Enforcement Administration ("DEA").

3.   I have received training in the detection and investigation of prohibited mailing offenses during a residential Basic Inspector Training program in Potomac, Maryland. I have also received training in financial investigations as they relate to drug trafficking organizations, firearms trafficking organizations, money laundering, and asset forfeiture. I have received field training and participated in many aspects of USPIS prohibited mailing investigations, including but not limited to, parcel interdiction, surveillance, controlled deliveries, execution of search warrants, interview and interrogation, confidential source/cooperating witness debriefing, and interception and analysis of electronic communications. I have written and executed search warrants that have resulted in the seizure of illegal drugs and evidence of drug violations. I am familiar with drug traffickers' methods of operation, especially as they relate to the Postal Service, including the storage, transportation, and distribution of drugs, the transfer and collection of money which represents the proceeds of drug trafficking, and money laundering.

4.   I know from my training and experience that the U.S. Mail is often used by drugs traffickers to transport controlled substances. I further know that the Priority Mail system is commonly used to transport controlled substances because this system provides reliability, traceability, and timely delivery.

5.   I know that the success of professional Drug Trafficking Organizations (DTOs) depends upon maintaining extensive contacts throughout the country and internationally. Specifically, individuals involved in drug trafficking must maintain contact with drug suppliers, drug couriers, drug customers, and others involved in the supply, transportation, distribution, sales, and marketing of controlled substances. The use of cellular telephone communication is essential in maintaining timely long-distance and local contacts with the original suppliers and those down the organizational chain, to include local traffickers.

6.   As a Postal Inspector and as a task force agent with the DEA, your affiant has participated in many aspects of drug investigations including conducting physical and electronic surveillance, analyzing telephone toll information obtained through subpoenas, and participating in investigations involving the intercept of wire communications, body recordings, and video surveillance. Your affiant has also participated in and executed numerous search-and-seizure warrants authorizing the search of real property and vehicles used by drug traffickers.  Materials searched for and recovered have included controlled substances, packaging materials, scales, cutting agents, weapons, documents, papers, electronic files and other media, receipts for concealed investments, and proceeds derived from the distribution of controlled substances.

7.   Your affiant is familiar with the methods that drug traffickers use to conduct their business, including, but not limited to, their methods of importing and distributing controlled substances, their use of mobile telephones, computers and other electronic devices, their use of businesses, houses, and other facilities in which controlled substances are stored and meetings are conducted, and their use of numeric codes and code words to conduct their drug transactions. Your affiant is also familiar with drug traffickers' use of communications devices, and texting applications and programs on such devices to conduct their business, including, but not limited to, transmitting information regarding price, quantity, and transportation of controlled substances.

8.   Based on your affiant's training, experience and participation in narcotics and drug related investigations and the training and experience of other Agents and Task Force Officers with whom I am working closely in this investigation, your affiant knows:

a.      That drug trafficking on a scale described herein is an economic crime based on the profits to be earned. Large-scale narcotics traffickers often maintain, on hand, large amounts of United States currency in order to maintain and finance their ongoing drug business.

b.      That persons engaged in drug trafficking commonly conceal controlled substances, currency, financial instruments, precious metals, jewelry, titles to automobiles, and other items of value in their residences, businesses, and automobiles.

c.      That when drug traffickers amass large proceeds from the sale of drugs, they attempt to legitimize profits through various money laundering techniques such as the placing of assets in nominee names, use of legitimate and sham/shell businesses, use of financial institutions, use of wire transmitters, and numerous other techniques. In this regard, drug traffickers often use domestic and foreign banks and/or financial institutions and their attendant services, securities, safe deposit boxes, cashier's checks, drafts, letters of credit, brokerage houses, real estate, "shell" corporations and businesses as "fronts" for their proceeds.

d.      That narcotics traffickers purchase assets with the proceeds of their unlawful activity and often place these assets in nominee names. Oftentimes, drug dealers place these assets in names of relatives, close acquaintances, or business entities to avoid detection and seizure of the assets by government agencies.

e.      That it is essential that members of drug distribution operations maintain contact with one another and use expedited means of communication to facilitate their criminal conduct. To accomplish this, continued access to telephone and/or electronic mail (E-mail) communications is necessary. The use of cellular telephones (traditional, pre-paid, and push-to-talk or direct connect) and text messaging and email electronic devices such as computers, tablets, iPads, and smartphones, are crucial to the success of drug traffickers in maintaining timely long-distance and local contacts with suppliers down the organizational chain to local traffickers and/or customers. These electronic devices, with video/photographic capabilities and vast storage capacity, allow individuals who deal in illegal controlled substances to not only maintain written or electronically stored entries which reflect names, addresses and/or telephone numbers for their current and past associates in drug trafficking (even if said items may be in code) but also many other aspects of criminal activity.

f.      That drug traffickers commonly "front" (provide on consignment) drugs to their customers, and frequently maintain records of same.

g.      That safes and/or concealed compartments are often used as locations to store drugs, currency, assets, and other proceeds and evidence of drug trafficking.

h.      That after purchasing controlled substances, traffickers will often transport, or have transported, the controlled substances to areas where they will distribute the controlled substances. Methods of transportation include but are not limited to commercial airlines, private aircraft, boats and ocean going vessels, rental and private automobiles, government and contract mail/parcel carriers.

i.      That it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or or the transfer of funds, and other papers relating to the transportation, ordering, sale, and, distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them. Such records also can be stored in electronic computer, tablet and/or smartphone memory media.

j.      That drug traffickers often take, or cause to be taken, photographs or videos of themselves, their associates, their property and assets, and their product, and these items are usually maintained in their residences. Such items also can be stored in electronic computer, tablet and smartphone memory media.

k.      That drug traffickers often keep readily available the paraphernalia for packaging, cutting, weighing, and distributing controlled substances. These items include, but are not limited to scales, plastic bags, and heat sealers.

l.      That drug traffickers commonly use electronic equipment to aid them in their drug trafficking activities. This equipment includes, but is not limited to, digital display pagers (beepers), cellular telephones, speed dialers, electronic telephone and date books, money

counters, fax machines, police scanners and devices such as computers, "tablets," iPad, and smartphones.

m.      That drug traffickers commonly have in their possession, that is, on their person, at their residences, in their automobiles, and their businesses, firearms and ammunition, among other weapons.  These firearms are used to protect and secure a drug trafficker's person and property.

n.      That drug smugglers using the U.S. Mail or other package delivery service often use fictitious names or names of others not closely associated with them so as to conceal their identity.

o.      It is common for drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, the residences of their associates, and residences of family members for ready access and to conceal them from law enforcement.

p.      Persons engaged in drug trafficking often times conceal in their residences and stash houses: drugs, scales, blenders, baggies, cutting agents, large amounts of cash, money counters, and other items used in preparing, packaging, selling and transporting narcotics

q.      Individuals involved in kilogram quantities of narcotics trafficking are commonly involved in bulk U.S. currency transfers in which the illegal drug proceeds are passed from the drug trafficker to an a member of the drug trafficking organization in the source area, who facilitates the transfer of currency to the drug cartel or supplier, who are typically located in border states such as California, Texas, Arizona, or are outside the United States, and in return the narcotics are then shipped or delivered to the local drug trafficker.

9.   The information in this affidavit is based in part on personal knowledge derived from the participation of your affiant and other law enforcement officers in this investigation and, in part, upon information provided by sources, surveillance by law enforcement, as well as other investigative activity. The information in this affidavit is provided for the limited purpose of establishing probable cause in connection with an application for a search and seizure warrant. The information is not a complete statement of all the facts relating to this investigation.

10. Pursuant to 21 U.S.C. §841(a)(1), it is a federal crime to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance, including methamphetamine.

11. Pursuant 21 U.S.C. §843(b), it is a federal crime to knowingly or intentionally use any communication facility, such as the U.S. Mail System, in committing or in causing or facilitating the commission of any act of drug trafficking. Similarly, conspiring to violate this section is also a felony. it is a federal crime to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance, including methamphetamine.

12. Pursuant 21 U.S.C. §846, it is a federal crime to conspire with others in an effort to manufacture, distribute, or dispense, or possess with intent to intent to manufacture, distribute, or dispense, a controlled substance, including methamphetamine.

13. Pursuant 18 U.S.C. §1956, it is a federal crime to conduct a financial transaction in an effort to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of a violation of federal law.

14. The offenses set forth in paragraphs 10 through 13, will be collectively referred to as the "Target Offenses."

15. Based on the facts set forth in this affidavit, there is probable cause to believe that evidence that will aid in the prosecution of violations of the target offenses will be located inside the Target Premises identified herein.

**TARGET PREMISES**

16. **1535 1/2 Lewis Street, Charleston, West Virginia 25311** ("Target Premises") is located within the city limits of Charleston in Kanawha County, West Virginia, and within the Southern District of West Virginia. The Target Premises is an upstairs apartment on top of a detached garage located behind the residence of 1535 Lewis Street, Charleston, West Virginia 25311. The Target Premises is within a light colored (white/gray) two story structure, with gray shingles. The front of the Target Premises is accessible via the alleyway off of Thompson Street in Charleston, West Virginia. There is a storm door over the front door of the Target Premises.

**PROBABLE CAUSE**

17. On April 11, 2024, while reviewing USPS electronic records relating to shipments of parcels to the Southern District of West Virginia from known sources states such as California, your affiant identified USPS Priority Mail Package bearing tracking number "9505 5130 1067 4101 5807 68" with a return address of "Juan Sebastian 1258 Lakme Ave Wilmington, CA 90744" and a delivery address of "Kevin Huffman 4927 Washington St. W Apartment D Charleston, WV 25313" (SUBJECT PARCEL 1). Based on your affiant's training and experience, your affiant believed the package to be consistent with the size, weight and mailing characteristics of packages containing narcotics proceeds and/or controlled substances.

18. On April 12, 2024, Postal Inspectors identified that SUBJECT PARCEL 1 had arrived at the Charleston, West Virginia Processing and Distribution Center (PDC). On the same date, Postal Inspectors went to the Charleston, West Virginia PDC, and noted, among other characteristics, that SUBJECT PARCEL 1 bore a handwritten label, postage purchased with cash, excessive tape, and was mailed from California, a known source state for illicit drugs coming into the Southern District of West Virginia.

19. Your affiant made inquiries with CLEAR, an electronic database that has proven reliable in previous investigations in determining the legitimacy of name, address, and phone number information, regarding the return address of Juan Sebastian, 1258 Lakme Ave, Wilmington, California 90744. CLEAR showed no such name associated with that address. Your affiant also conducted a search regarding the delivery address of Kevin Huffman, 4927 Washington Street West, Charleston, West Virginia 25313. CLEAR also showed no such name associated with that address.

20.      On April 12, 2024, Task Force Officer (TFO) Seth Johnson, Charleston Police Department, provided his trained narcotic detection dog, "Rex". Rex has experience with narcotics investigations including drug parcels and was last certified in April 2023. SUBJECT PARCEL 1 was placed in a line-up with four (4) additional boxes of similar shapes and sizes. Rex conducted an exterior examination of all the parcels. TFO Johnson informed your affiant that Rex positively alerted on SUBJECT PARCEL 1 indicating the presence of the odor of controlled substances. Based upon this information, your affiant seized SUBJECT PARCEL 1 and applied for a federal search warrant in the United States District Court for the Southern District of West Virginia.

21.      On April 16, 2024, after submitting a search warrant affidavit and application to United States Magistrate Judge Dwane L. Tinsley for the United States District Court for the Southern District of West Virginia, Judge Tinsley issued federal search warrant 2:24-mj-00068 authorizing the search of SUBJECT PARCEL 1 and the seizure of its contents.

22.      On April 16, 2024, at approximately 2:54pm, investigators executed the search warrant for SUBJECT PARCEL 1 and opened it to determine its contents. Upon opening SUBJECT PARCEL 1 from the bottom, your affiant identified a layer of spray foam. Upon cutting into the spray foam, your affiant identified two (2) orange plastic bags in separate vacuum sealed bags wrapped in aluminum foil and clear plastic. Upon removing the two (2) orange plastic bags,

your affiant noted that one of the two (2) bags listed "N 184" and the other bag listed "N 326" in black permanent marker. Your affiant then cut into the two (2) orange bags to identify their contents. Your affiant identified that each of the two (2) bags contained a crystalline substance consistent with methamphetamine. Your affiant then weighed the two (2) bags of methamphetamine and obtained a combined gross weight of 4546.4 grams. Your affiant then utilized a standardized NIK field test and tested a sample of the crystalline substance. The NIK test produced a blue result indicating a positive test for methamphetamine.

23. Between April 16-28, 2024, your affiant reviewed USPS business records relating to customer inquiries via USPS.com and the USPS customer service telephone hotline. Your affiant identified several internet protocol ("IP") addresses associated with both AT&T and Comcast Cable Communications, Inc. Specifically, your affiant identified four (4) unique internet protocol addresses associated with Comcast Cable Communications in the Houston, Texas area. Your affiant noted that each of the four (4) IP addresses began with the same first four segments, "2601:2c3:c57f:f580:". Your affiant also identified one (1) telephone number that had made two (2) calls to the USPS customer service telephone hotline on April 23, 2024. The telephone number is 424-494-9458 (TARGET PHONE #1), and it made both of the calls during which the caller was inquiring as to the current delivery status of SUBJECT PARCEL 1.

24. On April 25, 2024, while reviewing USPS electronic records relating to shipments of parcels from the Southern District of West Virginia to known source states, such as Texas, investigators identified USPS Priority Mail Express package bearing tracking number "EI 928 958 998 US" with a return address of "David Johnson 1535 Lewis Street Charleston West Virginia 25311" and a delivery address of "Earthly Carpet Cleaning 272 14173 N.W. Freeway Houston Texas 77040" (SUBJECT PARCEL 2). Additionally, your affiant identified SUBJECT PARCEL 2 was also subject to a tracking inquiry by an IP address with the same first four

segments as identified as inquiring on SUBJECT PARCEL 1. Based upon a review of USPS business records of online customer driven inquiries related to SUBJECT PARCEL 2, SUBJECT PARCEL 2 and SUBJECT PARCEL 1 are associated by common IP addresses identified in this investigation.

25. Based upon your affiant's training and experience, these same first four segments inquiring on SUBJECT PARCEL 1 and SUBJECT PARCEL 2 are related by the same subscriber.

26. On April 26, 2024, Postal Inspectors retrieved SUBJECT PARCEL 2 from the Charleston, West Virginia PDC and noted, among other characteristics that SUBJECT PARCEL 2 bore a handwritten label, cash paid postage, and was mailed to Texas, a known source state for illicit drugs coming into the Southern District of West Virginia.  TFO Johnson made inquiries with CLEAR, an electronic database that has proven reliable in previous investigations in determining the legitimacy of name, address, and phone number information, regarding the return address of "David Johnson 1535 Lewis Street Charleston West Virginia 25311". CLEAR showed this name does not associate at that address. TFO Johnson also conducted a search regarding the destination address of "Earthly Carpet Cleaning 272 14173 N.W. Freeway Houston Texas 77040".  CLEAR showed this name does not associate at that address. However, CLEAR does associate Earthly Carpet Cleaning to 7715 Bideford Lane, Houston, TX 77070. Furthermore, during an open-source internet search, Earthly Carpet Cleaning was identified with a Facebook page and website of "earthlycarpetcleaning.com" as it appeared to be a legitimate business in Houston, Texas.

27. On April 26, 2024, TFO Johnson provided his trained narcotic detection dog, "Rex". Rex has experience with narcotics investigations including drug parcels and was last certified in April of 2024. SUBJECT PARCEL 2 was placed in a line-up with four (4) additional boxes of similar

shapes and sizes.  Rex conducted an exterior examination of all the parcels. Rex positively

alerted on SUBJECT PARCEL 2 indicating the presence of the odor of controlled substances.

28. TFO Johnson applied for a search warrant of SUBJECT PARCEL 2 and requested that if

the contents of SUBJECT PARCEL 2 were revealed to be U.S. currency, money orders, monies,

or other forms of payment and also contained cover and/or concealment materials, that law

enforcement be afforded the option to seize only the packaging or cover materials for the

purpose of obtaining latent fingerprints and DNA evidence, if feasible. If this option is

employed, law enforcement would then replace the cover and/or concealment materials, inner

boxes, or similar related packaging materials. The U.S. currency, money orders, monies, or other

forms of payment would be documented via still photographs and other means, then be placed

back into replica packaging materials, as SUBJECT PARCEL 2 would be placed back into the

United States Mail for delivery. The use of this investigative technique is an attempt to identify

individuals utilizing the U.S Mail System for the shipment of narcotics proceeds in the

furtherance of drug trafficking violations.

29. A search warrant was issued for SUBJECT PARCEL 2 on April 26, 2024, by United

States Magistrate Judge Dwane L. Tinsley.  The search warrant was executed on the same date

and found to contain a piece of brown tissue paper and a book identified as Sycamore Row by

John Grisham.  The book was a hardback with a dust cover and had several pages cut out of the

inside forming a rectangular void.  Within the void was a plastic wrapped stack of $100 United

States currency notes that totaled $5,000. The plastic wrap was seized for fingerprints and

replaced with a new piece.  The dust cover of the book was dusted for latent prints by the

Charleston Police Department-Crime Scene Unit.  Several latent fingerprints were identified by

the Charleston Police Department-Crime Scene Unit and subsequently lifted. The book and

contents were then placed back together as it had been found with the $5,000 suspected narcotics

proceeds placed inside.  SUBJECT PARCEL 2 was then placed back into the United States Mail for delivery as part of an ongoing investigation. Those latent fingerprint lifts were subsequently submitted to the West Virginia State Police Forensic Laboratory for examination and analysis. On May 6, 2024, the West Virginia State Police Forensic Laboratory issued a lab report identifying one of the latent fingerprints lifted from the dust cover of the book recovered from SUBJECT PARCEL 2 as belonging to Daisjuan L. Russell (RUSSELL).

30. On May 1, 2024, Investigators conducted a review of USPS surveillance video at the Downtown Charleston, West Virginia Post Office in relation to the April 25, 2024, mailing of SUBJECT PARCEL 2.  The surveillance video revealed a male who appeared to be RUSSELL approach the counter with SUBJECT PARCEL 2. RUSSELL completed a USPS label which was placed on the parcel, paid in cash, and then departed the post office in a new white Nissan Altima sedan with a front and rear license plate.  This was believed to be the same vehicle RUSSELL has been identified as traveling in throughout this investigation.

31. While reviewing USPS electronic records relating to shipments of parcels to the Southern District of West Virginia from known source states, such as California, investigators identified USPS Priority Mail parcel bearing tracking number "9505 5131 7941 4117 1577 50" with a return address of "Juan Garcia 1204 Hyatt Ave Wilmington, CA 90744" and a delivery address of "William Dew 916 Chappell Rd. Charleston, WV 25304" (SUBJECT PARCEL 3).

32. Furthermore, investigators believed that this parcel also contained a large quantity of suspected methamphetamine as it was very similar in nature to SUBJECT PARCEL 1. Both SUBJECT PARCEL 1 and SUBJECT PARCEL 3 were USPS Large Flat Rate boxes with very similar tape and tape style.  They were both close in weight at over eleven pounds each.  The return address first names were both "Juan" with return addresses in Wilmington, California 90744 and they were both mailed from Long Beach, California.  Additionally, both parcels had a

handwritten label on the box that appeared to be the same handwriting. Based upon these factors, investigators decided to conduct surveillance of the routine delivery of SUBJECT PARCEL 3 in an attempt to identify the target of the investigation.

33. On April 29, 2024, USPIS, Homeland Security Investigations ("HSI"), and Metropolitan Drug Enforcement Network Team (MDENT) investigators conducted surveillance of the delivery of SUBJECT PARCEL 3 to 916 Chappell Road, Charleston, West Virginia 25304. At approximately 1441 hours, SUBJECT PARCEL3 was delivered to 916 Chappell Road, Charleston, West Virginia 25304.  A white Nissan Altima bearing West Virginia registration "408268A" on the rear and Virginia registration "TRM1474" on the front ("the vehicle") arrived in the driveway of 916 Chappell Road, Charleston, West Virginia 25304 at approximately 2:53 P.M. The front passenger (later identified as RUSSELL) exited the vehicle, collected SUBJECT PARCEL 3, walked back toward the vehicle but then took the parcel into the house at 916 Chappell Road, Charleston, West Virginia 25304.  After approximately an hour inside,RUSSELL returned to the vehicle but was now carrying a plastic bag that he placed in the trunk that was believed by investigators to be the contents of SUBJECT PARCEL 3.  The driver and RUSSELL were then followed by investigators as they made several short stops consistent with drug transactions.  The first stop was made at 506 Thompson Street, Charleston, West Virginia where TFO Johnson observed RUSSELL carrying a white plastic bag into the residence. Inspector Mehall had observed RUSSELL remove this bag from the trunk and believed it was part of the contents he placed into the trunk at 916 Chappell Road, Charleston, West Virginia 25304.

34. Investigators continued to follow the vehicle and identified a minimum of three additional short stops at various locations in Charleston, West Virginia. During one of the stops, the driver exited the vehicle and stayed behind and RUSSELL was became the driver and sole

occupant of the vehicle. Ultimately, investigators followed RUSSELL to the area of Thompson Street and Lewis Street in Charleston, West Virginia where he parked the vehicle and was observed entering the Target Premises.  RUSSELL was inside the Target Premises for over an hour.  When he exited the Target Premises, he was wearing different clothing which led investigators to believe that he resided at this location or, the very least, keeps some of his belongings there. TFO Johnson requested that Charleston Police Department Patrolmen Puckett and C. Napier conduct a traffic stop of the vehicle based upon his reasonable suspicion of drug trafficking and improper display of two different license plates on the vehicle.  It was during this traffic stop that RUSSELL was first identified. Surveillance was terminated on this specific date following the completion of the traffic stop.

35. While reviewing USPS electronic records relating to shipments of parcels to the Southern District of West Virginia from known source states, such as California, investigators identified USPS Priority Mail parcel bearing tracking number "9505 5138 2276 4120 7749 07" with a return address of "Michael Gomez 1258 Lakme Ave Wilmington, CA 90744" and a delivery address of "David Travis 1535 Lewis Street Charleston, WV 25311" (SUBJECT PARCEL 4).

36. Furthermore, investigators believed that this parcel also contained a large quantity of suspected methamphetamine as it was very similar in nature to SUBJECT PARCEL 1, All three inbound parcels (SUBJECT PARCELS 1, 3, and 4) were USPS Large Flat Rate boxes with very similar tape and tape style.  They were all close in weight at over eleven pounds.  The return addresses were all in Wilmington, California  90744 but they were all mailed from Long Beach, California.  Additionally, all three inbound parcels (SUBJECT PARCELS 1, 3, and 4) had a handwritten label on the box that appeared to be the same handwriting. Furthermore, SUBJECT PARCEL 4 and SUBJECT PARCEL 1, which was found to contain methamphetamine, bore the same return address with different names. Based upon these factors, investigators decided to

conduct surveillance of the routine delivery of SUBJECT PARCEL 4 in an attempt to identify any additional suspects or associated locations.

37. On May 1, 2024, TFO Johnson retrieved SUBJECT PARCEL 4 from the Charleston, West Virginia PDC.  TFO Johnson provided his trained narcotic detection dog, "Rex". Rex has experience with narcotics investigations including drug parcels and was last certified in April of 2024. SUBJECT PARCEL 4 was placed in a line-up with four (4) additional boxes of similar shapes and sizes.  Rex conducted an exterior examination of all the parcels. Rex positively alerted on SUBJECT PARCEL 4 indicating the presence of the odor of controlled substances. SUBJECT PARCEL 4 was then returned to the United States Mail for routine delivery the following day.

38. On May 2, 2024, USPIS, HSI, and Metropolitan Drug Enforcement Network Team (MDENT) investigators conducted surveillance of the delivery to 1535 Lewis Street, Charleston, West Virginia 25311.  Following delivery of SUBJECT PARCEL 4 to 1535 Lewis Street, Charleston, West Virginia 25311,  investigators were able to maintain visual on SUBJECT PARCEL 4 which was placed near the front door of the residence.  A female, believed to be the resident, eventually opened the front door, closely looked at SUBJECT PARCEL 4, and then picked it up and took it inside of the residence.  About an hour later, an unidentified black male arrived in the area driving the vehicle that RUSSELL was previously stopped in.  The male parked down the block away from the home, walked up the road, through the alley, and then into the front yard of the residence at 1535 Lewis Street, Charleston, West Virginia 25311.  The unknown male appeared to make a Facetime call based upon the positioning of the phone in front of his face.  The male then knocked on the front door of the residence at 1535 Lewis Street, Charleston, West Virginia 25311.  A female answered and took the phone as she appeared to be communicating on the Facetime call. She then handed the phone back to the male and provided

16

him with SUBJECT PARCEL 4.  The male handed her something in exchange from his pocket and carried the parcel to the front door of the Target Premises.  The male used a key to open the door and carried the parcel inside the Target Premises.  The male stayed at the Target Premises throughout the afternoon and evening and was only observed leaving on two occasions.  However, SUBJECT PARCEL 4 was never observed leaving the residence and is believed to have remained inside the Target Premises.

39. While reviewing USPS electronic records relating to shipments of parcels to the Southern District of West Virginia from known source states, such as California, investigators identified USPS Priority Mail parcel bearing tracking number "9505 5142 4751 4122 0018 06" with a return address of "Michael Garcia 1258 Lakme Ave Wilmington CA 90744" and a delivery address of "Tasha Williams 5140 Indiana Street South Charleston, WV 25309" (SUBJECT PARCEL 5).

40. Furthermore, investigators believed that this parcel also contained a large quantity of suspected methamphetamine as it was very similar in nature to SUBJECT PARCEL 1. All four inbound parcels (SUBJECT PARCELS 1, 3, 4, and 5) were USPS Large Flat Rate boxes with very similar tape and tape style.  They were all close in weight at over eleven pounds.  The return addresses were all in Wilmington, California  90744 but they were all mailed from Long Beach, California.  Additionally, all four inbound parcels (SUBJECT PARCELS 1, 3, and 4) had a handwritten label on the box that appeared to be the same handwriting. Furthermore, SUBJECT PARCEL 4, SUBJECT PARCEL 5, and SUBJECT PARCEL 1 which was found to contain methamphetamine, bore the same return address with different names. Based upon these factors, investigators decided to conduct surveillance of the routine delivery of SUBJECT PARCEL 5 in an attempt to identify if RUSSELL would collect SUBJECT PARCEL 5.

41. Investigators set up to conduct surveillance in and around 5140 Indiana Street, South

Charleston, West Virginia 25309 as SUBJECT PARCEL 5 was delivered. Investigators maintained surveillance in the area until the previously identified white Nissan Altima (the vehicle) drove down Indiana Street and approach the area around 5140 Indiana Street, South Charleston, West Virginia 25309. Investigators then observed RUSSELL exit the passenger seat of the vehicle, and approach the residence located at 5140 Indiana Street, South Charleston, West Virginia 25309. Investigators then observed RUSSELL collect SUBJECT PARCEL 5 from the front porch of the residence, and return to the vehicle. RUSSELL then opened the rear passenger door of the vehicle, and placed SUBJECT PARCEL 5 inside the vehicle. Investigators then maintained continuous surveillance of the vehicle, until a traffic stop could be conducted by the South Charleston Police Department. Cpl. Bailes of the South Charleston Police Department activated his lights and sirens behind the vehicle along MacCorkle Avenue in South Charleston, West Virginia. At that time, the vehicle fled from Cpl. Bailes and eventually came to stop in a near by neighborhood where the two subjects, one of which was RUSSELL and the other was Malik Breckenridge, fled the vehicle on foot, but were later apprehended.

42. The vehicle that RUSSELL has been observed traveling in during this investigation, including during the traffic stop on April 29, 2024, has been observed by investigators on numerous recent occasions parked near the Target Premises. These occasions include the evening of May 5, 2024, the morning of May 6, 2024, and multiple other occasions over the last five days.

43. On May 6, 2024, Investigators conducted a mirandized interview with Malik Breckenridge (BRECKENRIDGE) at the Charleston Police Department. BRECKENRIDGE told investigators that he picked up SUBJECT PARCEL 4 at the direction of RUSSELL from a female subject inside of 1535 Lewis Street and took it to an apartment out back identified as the Target Premises. BRECKENRIDGE stated he used a key previously provided by RUSSELL to

18

open the door to the Target Premises and take the parcel inside.

44. Based upon your affiant's training and experience, and conversations with other law enforcement agents, your affiant believes that RUSSELL is a local distributor of methamphetamine in the Charleston, West Virginia metropolitan area. RUSSELL is believed to maintain belongings and/or reside at the Target Premises, and it is believed to contain evidence of drug trafficking and/or money laundering activities to include RUSSELL's involvement in the conspiracy to commit those offenses.

## CONCLUSION

45. Based upon the foregoing, I submit there is probable cause that the Target Premises (more fully described in "Attachment A") is a location that your Affiant believes to have play a significant role for the individuals both identified and not identified in the drug trafficking organization currently under investigation. Your Affiant believes that there is evidence of violations of 21 USC § 841(a)(1), 21 USC § 843(b), 21 USC § 846, and 18 USC § 1956 at the Target Premises.

Respectfully submitted,

BRANDON S. HOLESTINE
POSTAL INSPECTOR

Subscribed and sworn to before me by telephonic or other reliable means pursuant to Fed. R. Crim. P. 4.1 on _____May 6_____, 2024.

DWANE L. TINSLEY
UNITED STATES MAGISTRATE JUDGE

19